**STATE of Missouri, Respondent,**

v.

**Alta Renee MORAN, Appellant.**

**No. WD 69397.**

Missouri Court of Appeals, Western District.

Sept. 29, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 24, 2009.

---

Jerome Y. Biggs, Jr., Special Prosecuting Attorney, Albany, MO, for Respondent.

Matthew Ward, Assistant State Public Defender, Columbia, MO, for Appellant.

Before Division II: VICTOR C. HOWARD, Presiding Judge, and JOSEPH M. ELLIS and MARK D. PFEIFFER, Judges.

MARK D. PFEIFFER, Judge.

Alta Moran (Moran) appeals the trial court's judgment convicting her of four counts of violating court orders prohibiting her from having contact with M.R.E. and D.D.D., one count of disturbing the peace, and one count of assault. On appeal, she presents two points. We affirm.

Moran is the biological mother of M.R.E. and D.D.D. In 2004, she was sentenced to a term of imprisonment for a felony conviction. While Moran was in prison, Ed and Toni Anderson served as guardians of her children. In 2007, Moran was released from prison.

In June 2007, the Andersons sought orders of child protection against Moran. The trial court granted the relief sought in the petitions and issued *ex parte* orders prohibiting Moran from abusing, threatening to abuse, stalking, molesting, disturbing the peace, or contacting either M.R.E. or D.D.D. Moran was personally served with notice of the orders.

On July 12, 2007, M.R.E. was riding his bicycle when he passed his mother who was sitting in a parked vehicle, coincidentally, on the same street that he was riding his bicycle. As M.R.E. rode by, Moran yelled, "I'll get you back!" Moran's threatening tone and commentary upset her young son, M.R.E. When M.R.E. returned home after the confrontation with Moran, Toni Anderson noticed that he was visibly upset. M.R.E. refused to eat, and he became very isolated. When Anderson approached him about his behavior, he became aggressive. Over the next month, in violation of the child protection orders, Moran repeatedly approached M.R.E. and D.D.D. and menacingly communicated to them that she would "get them back!" Moran also physically assaulted D.D.D.

The State arrested Moran and charged her with four counts of violation of a child protection order, one count of assault, and one count of peaceful disturbance. One of the State's counts for violation of a child protection order alleged that Moran abused M.R.E. when she yelled to him, "I'll get you back!"

After the State arrested her, but before her trial, Moran approached D.D.D. again and told her that if she continued to talk to the prosecuting attorney or testified at trial, Moran would kill her. This was a separate and uncharged incident as it relates to the underlying criminal trial.

Moran's case went to trial in January 2008. At trial, M.R.E. testified regarding his encounter with Moran on July 12, 2007. D.D.D. also testified and, during her testimony, she testified that she saw Moran two weeks prior to trial, at which point Moran threatened to kill her if she testified at trial. Moran did not object to D.D.D.'s testimony. At the conclusion of the evidence, Moran moved for a judgment of acquittal on one of the violations of a

child protection order because M.R.E.'s testimony that Moran yelled, "I'll get you back!" was not sufficient to constitute abuse. The trial court denied the motion. The jury returned a verdict finding Moran guilty of all six counts. The trial court entered judgment. This appeal follows.

In her first point, Moran claims that the trial court erred in overruling her motion for acquittal on the charge of violating an order of protection by abusing M.R.E. because the State failed to establish an element of its *prima facie* case: that Moran emotionally abused M.R.E. Moran concedes that the State adduced evidence that M.R.E. was riding his bicycle in the Andersons' neighborhood (his home) when Moran, who was parked in a vehicle on a street in the Andersons' neighborhood, yelled, "I'll get you back!" Nevertheless, she claims that her conduct does not rise to the level of emotional abuse.

Our review of whether or not the trial court erred in overruling Moran's motion for judgment of acquittal is limited to determining whether or not the evidence was sufficient to persuade a reasonable juror, beyond a reasonable doubt, of each of the crime's elements. *State v. Redifer,* 215 S.W.3d 725, 730 (Mo.App. W.D.2006). We do not weigh the evidence or judge the witnesses' credibility. *Id.* We review the evidence in a light most favorable to the verdict and disregard all contrary evidence. *Id.* at 730–31.

The Due Process Clause requires the State to prove every element of the crime charged beyond a reasonable doubt. *Id.* at 730. In this case, the State charged Moran with, among other things, one count of violating the terms of an *ex parte* order of protection in violation of section

455.538.[1] Section 455.538.4(1) states that a "[v]iolation of the terms and conditions of a full order of protection for a child regarding abuse, child custody, or entrance upon the premises of the petitioner's dwelling unit, shall be a class A misdemeanor." In its information, the State alleged that "in that on or about July 12, 2007, the defendant, having knowledge of an order of the Circuit Court of Gentry County that prohibited the defendant from abusing the child victim M.R.E., knowingly violated the terms and conditions of the order by talking to him while he was riding his bicycle thereby inflicting emotional abuse." Thus, given the law of section 455.538 and the State's information, to prove its case, the State was obligated to present evidence that (1) the Circuit Court of Gentry County entered an order prohibiting defendant from abusing M.R.E., (2) on or about July 12, 2007, the defendant had been served with the order, and (3) the defendant knowingly violated the terms and conditions of that order by abusing M.R.E. by yelling at him when he was riding his bicycle. MAI–CR 332.52 (1–1–05).

On appeal, Moran concedes that the Circuit Court of Gentry County entered an order prohibiting her from abusing M.R.E. and that she was aware of the order. She also concedes that, while M.R.E. rode his bicycle past her, she yelled out "I'll get you back!" She maintains on appeal, however, that her act of yelling "I'll get you back!" does not meet the definition of abuse.

Section 455.501(1) defines abuse as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by an adult household member, or stalking of a child. Discipline including spanking, administered in a reasonable manner shall not be construed to be abuse[.]" In this case, the State al-

leged that Moran had emotionally abused M.R.E.

Although Missouri recognizes that emotional abuse has ties to mental abuse, neither the General Assembly nor the courts have defined emotional abuse or mental abuse. *See Reller v. Hamline*, 895 S.W.2d 659, 662 (Mo.App. W.D.1995). Other states do have definitions of emotional abuse or mental abuse. For example, Minnesota defines mental injury as "an injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in the child's ability to function within a normal range of performance and behavior with due regard to the child's culture." Minn.Stat. § 626.556.2(m) (2008). Minnesota's definition is similar to the definition of numerous other states. *See* Nev.Rev.Stat. § 432B.070 (2000) (mental injury is "an injury to the intellectual or psychological capacity or the emotional condition of a child as evidenced by an observable and substantial impairment of his ability to function within his normal range of performance or behavior"); S.D. Codified Laws § 26–8A–2 (2008) (South Dakota defines emotional harm or mental injury as an "injury to the child's intellectual or psychological capacity evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior, with due regard to the child's culture[.]"); Tenn.Code Ann. § 37–1–602 (2008) (Tennessee defines mental injury as an "injury to the intellectual or psychological capacity of a child as evidenced by a discernible and substantial impairment in the child's ability to function within the child's normal range of performance and behavior, with due regard to the child's culture[.]"); Tex. Fam.Code Ann. § 261.001

---

1. Unless otherwise indicated, all statutory references are to RSMo 2000.

(2007) (Texas defines abuse, as among other things, a "mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning[.]"). From a survey of our sister states, it appears that the typical language used in these definitions is "injury to the psychological capacity or emotional stability of the child as evidenced by an observable or substantial change in behavior, emotional response, or cognition," or as evidenced by "anxiety, depression, withdrawal, or aggressive behavior." *See* Child Welfare Information Gateway, *Definitions of Child Abuse and Neglect: Summary of State Laws*, page 3 (2007), *http:// www. childwelfare.gov/system-wide/laws_policies/statutes/define.cfm.*

■ This language is consistent with the dictionary definition of emotional abuse. For example, MOSBY'S MEDICAL DICTIONARY defines emotional abuse as "the debasement of a person's feelings that causes the individual to perceive himself or herself as inept, not cared for, and worthless." MOSBY'S MEDICAL DICTIONARY 635 (7th ed.2006). Thus, given these numerous definitions of emotional abuse, we conclude that emotional abuse is an injury to the child's psychological capacity or emotional stability, which is demonstrated by an observable or substantial change in the child's behavior, emotional response, or cognition, including anxiety, depression,

withdrawal, or aggressive behavior. The State may use either lay witnesses or expert witnesses to establish that the child's injury resulted in an observable or substantial change in his behavior, emotional response, or cognition. *Reller,* 895 S.W.2d at 662.[2]

In this case, the State presented evidence from which the jury could have concluded that Moran's remark caused an injury to M.R.E.'s psychological capacity or emotional stability. The evidence at trial established that the State had placed M.R.E. in the custody of the Andersons who were appointed as his guardians. Prior to the encounters with Moran in 2007, Moran had just been released from prison after serving approximately three years for a felony conviction. The children's guardians were so fearful of contact by Moran that they sought and obtained orders of child protection. The evidence also established that, although M.R.E. was happy and wanted to stay with the Andersons, Moran had filed a petition to terminate the Andersons' guardianship. M.R.E. testified on direct examination and cross-examination that Moran's yelled threat, "I'll get you back!" upset him because he wanted to stay with the Andersons and did not want to live with Moran. Toni Anderson testified that she saw M.R.E. right after Moran made her threat, and M.R.E. told her that he was scared but would not tell her what scared him. From this evidence, the jury

**2.** The State's ability to use either lay witnesses or medical experts to establish the impact of the emotional abuse on the child in a criminal case mirrors the civil law in the State of Missouri. As our Supreme Court noted in *State ex rel. Dean v. Cunningham,* 182 S.W.3d 561, 568 (Mo. banc 2006), to establish a civil claim for *negligent* infliction of mental distress, unaccompanied by physical injury, the plaintiff must establish that the negligent act resulted in a medically diagnosed condition via medical expert witness testimony. On the other hand, to establish a civil claim for *inten-*

*tional* infliction of emotional distress, the plaintiff does not need to present expert medical testimony to prove that he suffers from emotional distress. *Id.* In this case, since the State alleged that Moran knowingly violated the terms and conditions of that order by abusing M.R.E., this case is more akin to an intentional infliction of emotional distress, which does not require expert medical testimony, than to the negligent infliction of emotional distress, which does require expert medical testimony.

had a reasonable basis for concluding that Moran's comment was a threat, which had the effect of tormenting M.R.E. with the possibility that he would have to leave the Andersons' home.

Furthermore, the State presented evidence that M.R.E.'s interaction with Moran substantially changed his behavior. Toni Anderson testified that, after M.R.E.'s interaction with Moran, he isolated himself, quit playing outside, and became noticeably reticent. Anderson testified that M.R.E. also lost weight because he quit eating. Anderson testified that M.R.E. became more aggressive and would cry more often. From this evidence, the jury had a reasonable basis for concluding that Moran's intentional and malicious remark resulted in an observable or substantial change to M.R.E.'s behavior and emotional stability. This is sufficient to conclude that Moran's conduct constituted emotional abuse.

On appeal, Moran does not deny this evidence. She, however, points to other abuse cases in an attempt to prove that her behavior was "less severe" than the defendant's behavior in those cases. For example, she points out that, in *In the Interest of T.G.*, 965 S.W.2d 326, 333 (Mo. App. W.D.1998), this court held that the trial court did not abuse its discretion in terminating the father's parental rights on the basis that he severely abused his children because the evidence established that the father murdered the children's mother in front of the children. Moran may very well be correct that this is a more *extreme* example of emotional abuse. That, however, does not mean that her behavior was *not* emotional abuse. The trial court did not err in overruling her motion for judgment of acquittal. Moran's first point is without merit.

◼ In her second point, Moran claims that the trial court erred in plainly failing to *sua sponte* strike D.D.D.'s testimony that, before the trial, Moran threatened to kill her if she testified at trial against her because Moran argues that the evidence was inadmissible evidence of uncharged crimes. Specifically, she claims that this evidence was inadmissible evidence of uncharged crimes because it was introduced solely to establish her propensity to commit the alleged crimes. Moran concedes that she did not object to the evidence. Thus, she requests plain error review pursuant to Rule 30.20.

Rule 30.20 grants us authority to consider "plain errors affecting substantial rights . . . when [we find] that manifest injustice or miscarriage of justice has resulted" from the error. Under plain error review, we first examine the record to determine whether or not the appellant's claim is one that, on its face, establishes grounds for believing that a manifest injustice has occurred. *State v. Norman*, 178 S.W.3d 556, 560 (Mo.App. W.D.2005). If our review of the record determines that plain error is facially established and such error establishes substantial grounds for believing that manifest injustice has occurred, only then do we review the record to determine whether or not a manifest injustice or a miscarriage of justice actually occurred. *Id.* Conversely, in the absence of such a determination, appellate courts should decline to exercise discretion to review for plain error under Rule 30.20. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). "The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review." *State v. Houston*, 139 S.W.3d 223, 227 (Mo.App. W.D.2004). "'Plain error is evident, obvious, and clear error.'" *Norman*, 178 S.W.3d at 560 (*quoting State v. Bailey*, 839 S.W.2d 657, 661 (Mo.App. W.D.1992)).

At trial, the State asked D.D.D. to describe the last time she had talked to Moran. D.D.D. testified that she saw Moran two weeks before trial when Moran threatened to kill her if she testified against her at trial:

Q. Okay. Now, was that the last time you saw your mother before today?

A. No.

Q. When was the last time you saw your mother?

A. Two weeks ago.

. . . .

Q. Okay. What did she do?

A. She—I was walking, and she pulled up in her car next to me, and she—she said if I talked to you, that she would jump up and start screaming and kill me.

THE COURT: I don't want to interrupt the testimony, but I did not hear that. Did everybody on the jury hear that?

Q. Honey, this is pretty important. You're doing fine. Take a deep breath. And tell—See that guy over there in the checkered shirt? He wants to hear what you have to say. Tell us again what your mother told you when she stopped you about two weeks ago when you're around school in Stanberry.

A. She said she—said that if I talked about stuff in June, she would jump up and start screaming and kill me.

Q. Did you say something about a jury?

A. I don't think so.

Q. Pardon?

A. This time.

Q. You mean here today?

A. Yes.

Q. If you told the people what happened?

A. Yes.

Q. She would do what?

A. Kill me.

Article 1, section 17, of the Missouri Constitution states that "no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information." Article 1, section 18(a) of the Constitution states, "That in criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation[.]" Based on these provisions, the State is allowed to try a defendant only for the offense for which she is on trial. See State v. Batiste, 264 S.W.3d 648, 650–51 (Mo.App. W.D.2008). These provisions preclude the State from unjustifiably introducing evidence of a defendant's uncharged crimes or bad acts for the purpose of establishing her propensity to commit the charged crime. Id. Thus, Moran is correct that the State could not introduce evidence of her uncharged crimes or bad acts for the purpose of establishing her propensity to commit the charged crimes.

The State, however, was allowed to introduce evidence of Moran's uncharged crimes for other purposes. Id. at 651. Evidence of a bad act may be admissible for an alternative purpose if the evidence is both logically and legally relevant. Id. Evidence is legally relevant when it has some legitimate tendency to establish the accused's guilt of the charged crimes. Id. Evidence is legally relevant when its probative value outweighs its costs. Id. These costs include the danger of unfair prejudice, confusion of the issues, the risk of misleading the jury, undue delay, or needless presentation of cumulative evidence. State v. Berwald, 186 S.W.3d 349, 359 (Mo. App. W.D.2005).

In that regard, the State was allowed to introduce D.D.D.'s testimony for the valid purpose of establishing Moran's conscious-

ness of guilt. *See State v. Cannon*, 215 S.W.3d 295, 301 (Mo.App. W.D.2007) (evidence that defendant threatened a witness is admissible to show consciousness of guilt); *State v. Davidson*, 242 S.W.3d 409, 415 (Mo.App. E.D.2007). From D.D.D.'s testimony, the jury had a reasonable basis for inferring that Moran knew that she had violated the court orders and that, if D.D.D. testified, she was likely to be convicted at trial. Thus, D.D.D.'s testimony established that Moran was attempting to conceal her crime by threatening D.D.D. This evidence, therefore, was logically relevant because it established her consciousness of guilt regarding the charged offenses. *See Cannon*, 215 S.W.3d at 301; *Davidson*, 242 S.W.3d at 415.

■ The evidence was also legally relevant. The evidence was highly probative of Moran's consciousness of guilt. The cost of this evidence was minimal. Of the five "costs" that were discussed in *State v. Berwald*, the only one that Moran claims is applicable in her case is the danger of unfair prejudice because her encounter with D.D.D. might have been a violation of the court order and the jury may have convicted her of that violation instead of the violations in the State's information. Moran, however, points to nothing in the record to show that the State ever used D.D.D.'s testimony regarding their encounter as an independent violation of the court order. Thus, we believe that this evidence had little, if any, unfair prejudicial effect. The probative value of D.D.D.'s testimony greatly outweighed its possible prejudicial effect. D.D.D.'s testimony was, therefore, admissible. The trial court did not err in failing to *sua sponte* strike D.D.D.'s testimony. Moran's second point is without merit.

We affirm the trial court's judgment.

VICTOR C. HOWARD, Presiding Judge, and JOSEPH M. ELLIS, Judge, concur.